**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BOARD OF TRUSTEES OF THE | ) | |
| HEALTHCARE OF ONTARIO | ) | |
| PENSION PLAN TRUST FUND, | ) | CASE NO. |
| 1 Toronto Street, Suite 1400 | ) | |
| Toronto, Ontario M5C 3B2, | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR MONEY DAMAGES** |
| | ) | |
| INTUIT, INC. | ) | |
| 2700 Coast Avenue | ) | |
| Mountain View, CA 94043 | ) | |
| c/o CORPORATION SERVICE | ) | |
| COMPANY, Statutory Agent | ) | |
| 2730 Gateway Oaks Drive, suite 100 | ) | |
| Sacramento, CA 95833, | ) | |
| | ) | |
| Defendant. | ) | |

Now comes Plaintiff, The Board of Trustees of the Healthcare of Ontario Pension Plan Trust Fund ("HOOPP"), and for its Complaint against Defendant, Intuit, Inc. ("Intuit"), alleges and states as follows:

**JURISDICTION AND VENUE**

1. Pursuant to 28 U.S.C. § 1332(a), this Court has subject matter jurisdiction based upon diversity of citizenship because HOOPP is a foreign pension trust settled under the laws of Ontario, with its principal place of business in Ontario, Canada; Intuit is a Delaware for-profit corporation, with its principal place of business in Mountain View, California; and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

2.	This Court has personal jurisdiction over Intuit because this action arises out of its business activities and/or its contracting to supply services or goods in and from the State of Ohio through Intuit's Real Estate Solutions division, which was located in Cleveland, Ohio for all times pertinent hereto.

3.	Venue is proper in the United States District Court for the Northern District of Ohio because a substantial part of the events or omissions giving rise to the claims at issue occurred within this Judicial District. *See id.* § 1391(a)(2).

## FACTUAL ALLEGATIONS

4.	HOOPP, formerly known as Hospitals of Ontario Pension Plan, is one of Ontario's largest pension plans serving its healthcare community. HOOPP provides eligible members with a defined lifetime retirement income based on a formula that takes into account a member's earnings history and length of service in the plan.

5.	To manage the plan's assets, HOOPP utilizes a diversified, long-term investment strategy. HOOPP formulates and actively manages its investment strategy by, among other things, analyzing computer-generated models and investment scenarios.

6.	In or around early 2009, HOOPP considered upgrading its then-existing software that it utilized to formulate and manage its real estate portfolio investments. Specifically, HOOPP required software that would be capable of generating multiple models and investment scenarios for HOOPP to take into consideration in directing and managing the pension plan's real estate portfolio investments. HOOPP considered securing a license for such software from its then-current vendor, Intuit, or other such software vendors.

7.	In conjunction with HOOPP's efforts to obtain such software to upgrade its then-existing software, Intuit advised HOOPP that it had an additional product called IMPACT that

could address the investment forecasting needs described by HOOPP. HOOPP reviewed the software from other vendors and Intuit. Ultimately, HOOPP narrowed its choice to Intuit since its product was native to HOOPP's system and Intuit's product information and demonstrations conveyed that it would meet HOOPP's requirements.

8. In or around March 2009, HOOPP commenced discussions with Intuit focused on IMPACT, the product licensed and supplied by Intuit. Intuit also provided HOOPP with a brochure designed to inform HOOPP as to IMPACT's capabilities. These discussions culminated in Intuit conducting product demonstrations of IMPACT for HOOPP on April 17, 2009 at HOOPP's offices.

9. Prior to and during Intuit's in-person product demonstration, HOOPP informed employees and/or authorized agents of Intuit of its integral requirements for and intended use of the software it sought to license. That is, HOOPP advised these individuals of its material requirement that the software be able to create multiple models and investment scenarios. Moreover, HOOPP informed Intuit's employees and/or authorized agents of its material need for the software to be able to interface with its then-existing real estate information system, another product previously purchased from and licensed by Intuit to HOOPP.

10. Prior to and during Intuit's in-person product demonstration, Intuit employees and/or authorized agents expressly represented to HOOPP that IMPACT would be able to create multiple models and investment scenarios for HOOPP, consistent with HOOPP's expressly stated needs. Moreover, these individuals represented to HOOPP that IMPACT would successfully interface with HOOPP's then-existing system with ease.

11. At or around the time Intuit was making these representations to HOOPP, Intuit likewise marketed IMPACT to the general public as a real estate investment tool capable of providing multiple models and investment scenarios.

12. As a direct result of and in reliance on the representations and promises made by Intuit regarding IMPACT's functions, capabilities, and integration ease, HOOPP entered into a licensing and services contract with Intuit for IMPACT.

13. Effective June 17, 2009, HOOPP entered into a Master License and Services Agreement with Intuit (the "Agreement"), which is attached hereto as Exhibit 1.[1] The Agreement provided for Intuit to supply to HOOPP a user license, software maintenance services, applications and technical support, and consulting services related to IMPACT. *Id.*

14. Prior to and after entering into the Agreement, HOOPP primarily communicated with Intuit's Real Estate Solutions division located in Cleveland, Ohio. Upon information and belief, Intuit sold the Real Estate Solutions division at some point in 2010.

15. As part of the Agreement, HOOPP agreed to and did, in fact, pay $657,897.16 in United States currency for IMPACT licensing and internal and vendor consultant fees, thereby fulfilling its obligation to Intuit under the Agreement.

16. As part of and as incorporated into the Agreement, the parties agreed to Work Authorization #24747 on July 21, 2009 (the "Work Authorization"). The Work Authorization provided that Intuit would modify, implement and integrate IMPACT into HOOPP's then-existing system in a usable and acceptable manner to HOOPP. The deadline for Intuit to

---

[1] Contemporaneous with this filing, Plaintiff will file a related Motion for Leave to File Under Seal Exhibit 1 to the Complaint. This exhibit was designated "CONFIDENTIAL INFORMATION" by Defendant. Plaintiff will file Exhibit 1 as soon as the Court rules on the Motion for Leave.

complete this scope of work was initially set for November 12, 2009, but was extended by Intuit to February 3, 2010.

17. The Agreement required Intuit to provide employees and/or authorized agents to work on-site at HOOPP to integrate IMPACT into HOOPP's then-existing system and to implement IMPACT consistent with its intended and represented functionality.

18. Because of numerous failures associated with IMPACT, the February 3, 2010 deadline came and passed without Intuit meeting its obligation to integrate and implement IMPACT into HOOPP's system in a useable and acceptable manner.

19. Beginning in or around October 2009, HOOPP discovered that there were product issues that were listed on status reports submitted by Real Foundations, Intuit's third-party implementation consultant.

20. On or around December 2, 2009, IMPACT was given an "AT RISK" status by Real Foundations because of major technical issues surrounding the software, including, without limitation, its inability to process balance sheet reporting and properly effect a data load from HOOPP's then-existing system to IMPACT.

21. On or around December 3, 2009, HOOPP began notifying and questioning Intuit about the failures surrounding IMPACT's integration and functionality. Previously, HOOPP had been assured prior that all technical issues were being resolved and would be resolved "soon."

22. In response to HOOPP's December 3, 2009 notice to Intuit of IMPACT's inability to properly function, Intuit employees and/or authorized agents repeatedly assured HOOPP that the issues surrounding IMPACT's functionality would be resolved and that IMPACT would perform for HOOPP as represented and agreed to by Intuit. In fact, Intuit promised HOOPP that

all project issues would be resolved by December 31, 2009. The IMPACT deficiencies were not resolved by the close of 2009.

23. On January 11, 2010, HOOPP again advised Intuit of serious issues with IMPACT's functionality. In response to these serious concerns, HOOPP placed a hold on paying Intuit's invoices for December. Intuit agreed HOOPP should not be billed for services in December due to the continued technical issues with IMPACT.

24. In February 2010, Intuit employees and/or representatives informed HOOPP that the problems related to IMPACT had been resolved and that HOOPP should expect a forthcoming work plan to move forward with the complete project integration and implementation. While HOOPP did receive limited information in March 2010 related to a work plan, it did not receive specific information on the anticipated and expected project integration and implementation.

25. The technical issues that had precipitated the "AT RISK" designation by Real Foundations prompted suspension of attempts to implement IMPACT at HOOPP. While suspended, Intuit represented that it would work on the technical issues related to IMPACT. During this time, HOOPP was not advised that the models and scenarios were not working. That functional deficiency was not revealed to HOOPP until August 2010. The project was never resumed after Real Foundations' December 2009 suspension of the project.

26. From March 2010 through August 2010, HOOPP repeatedly contacted Intuit employees and/or its authorized agents to determine when the IMPACT integration and implementation would be fully completed.

27.     In August 2010, HOOPP learned through industry reports, which were later confirmed by Intuit employees and/or representatives, that IMPACT was being shelved and was no longer being licensed and supplied.

28.     Because of the severe and project-disabling failures associated with IMPACT, the product was never capable of use by HOOPP.  HOOPP has never been provided with a working piece of software for HOOPP to use for its real estate portfolio investments.  Thus, HOOPP has never accepted IMPACT.

29.     To date, IMPACT has never been implemented into HOOPP's system and its functionality has never conformed with the representations made by Intuit, representations on which HOOPP relied and which formed the basis for the Agreement between the parties.

30.     HOOPP has made attempts to seek reimbursement from Intuit related to IMPACT's failure.  Its latest attempt came in the form of a December 16, 2010 letter in which HOOPP issued a demand for Intuit to repay HOOPP the total amount of remuneration paid to Intuit for IMPACT, namely $657,897.16, because of IMPACT's inability to perform as promised, represented, and agreed to by Intuit.  As of the date of filing this Complaint, Intuit has not made this payment to HOOPP or contacted it regarding payment arrangements.

## COUNT I
## BREACH OF CONTRACT

31.     HOOPP restates and incorporates by reference the foregoing paragraphs as if fully rewritten herein.

32.     HOOPP and Intuit entered into the Agreement by which Intuit agreed to modify, integrate, and implement IMPACT into HOOPP's then-existing system for acceptance and use by HOOPP and in accordance with a license granted to HOOPP.

33. HOOPP has fully performed any obligation under the Agreement; to wit, it paid Intuit $657,897.16 in conjunction with the Agreement.

34. Intuit materially breached its obligation under the Agreement to modify, integrate, and implement IMPACT into HOOPP's then-existing system.

35. Intuit's breach of the Agreement has directly and proximately caused and will cause direct damages to HOOPP in excess of $657,897.16.

## COUNT II
## PROMISSORY ESTOPPEL

36. HOOPP restates and incorporates by reference the foregoing paragraphs as if fully rewritten herein.

37. Intuit made clear and unambiguous promises to HOOPP regarding the functionality and capabilities of IMPACT.

38. In entering into the Agreement with Intuit, HOOPP reasonably and forseeably relied to its detriment on Intuit's promises regarding IMPACT's technical and integration capabilities.

39. In making payments totaling $657,897.16 for the IMPACT license and consulting fees pursuant to the Agreement, HOOPP reasonably relied to its detriment on Intuit's promises regarding IMPACT's technical and integration capabilities.

40. HOOPP would not have entered into the Agreement with Intuit absent these promises and representations made by Intuit.

41. HOOPP has suffered and will to continue to suffer damages directly caused by its reasonable and foreseeable reliance on Intuit's promises regarding IMPACT's technical and integration capabilities.

## COUNT III
## FRAUDULENT INDUCEMENT

42.     HOOPP restates and incorporates by reference the foregoing paragraphs as if fully rewritten herein.

43.     At the time of contracting, Intuit represented to HOOPP that IMPACT would easily and successfully integrate with HOOPP's then-existing system and would be able to generate multiple models and investment scenarios meeting HOOPP's expressly stated need for these features for HOOPP to manage and direct the plan investment funds.

44.     These representations by Intuit were material to the parties' contractual relationship, and without which Intuit knew that HOOPP would not have entered into the Agreement with Intuit.

45.     HOOPP reasonably relied upon Intuit's representations as described in this Count III and in the Factual Allegations.

46.     Intuit's representations were knowingly false and/or made with reckless disregard for the truth with the intent to induce HOOPP to enter into the Agreement with Intuit.

47.     HOOPP has suffered and will continue to suffer damages proximately caused by its reasonable reliance on Intuit's misrepresentations regarding IMPACT's capabilities.

48.     HOOPP is entitled to recover its actual damages in excess of $657,897.16 and attorney's fees caused by Intuit's fraudulent inducement and punitive damages in an amount to be determined at trial.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

49.     HOOPP restates and incorporates by reference the foregoing paragraphs as if fully rewritten herein.

50. At the time of contracting, Intuit represented to HOOPP that IMPACT would easily and successfully integrate with HOOPP's then-existing system and would be able to generate multiple models and investment scenarios meeting HOOPP's expressly stated need for these features for HOOPP to manage and direct the plan investment funds.

51. These representations by Intuit were material to the parties' contractual relationship, and without which Intuit knew that HOOPP would not have entered into the Agreement with Intuit.

52. HOOPP reasonably relied upon Intuit's representations as described in this Count IV and in the Factual Allegations.

53. Intuit failed to exercise reasonable care or competence in obtaining or communicating information regarding IMPACT's capabilities and/or functionality within HOOPP's then-existing system, acting with conscious disregard for HOOPP.

54. HOOPP has suffered and will continue to suffer damages in excess of $657,897.16 proximately caused by its reasonable reliance on Intuit's misrepresentations regarding IMPACT's capabilities, and it is entitled to reasonable attorney's fees, costs, and punitive damages.

WHEREFORE, HOOPP respectfully requests that this Court grant judgment to it against Defendant on each and every claim contained herein and award it damages as follows:

(a) As to Count I, damages in excess of $657,897.16, plus interest at the statutory rate, all to be more particularly stated and established at trial;

(b) As to Count II, damages in excess of $657,897.16, plus interest at the statutory rate, all to be more particularly stated and established at trial;

(c)  As to Count III, damages in excess of $657,897.16, plus interest at the statutory rate, reasonable attorney's fees, costs, and punitive damages, all to be more particularly stated and established at trial;

(d)  As to Count IV, damages in excess of $657,897.16, plus interest at the statutory rate, reasonable attorney's fees, costs, and punitive damages, all to be more particularly stated and established at trial; and

(e)  For such other and further relief as this Court deems equitable and just.

Respectfully submitted,


*/s/ Nicole J. Quathamer*
Nicole J. Quathamer (0070893)
Charles W. Zepp (0068129)
PORTER WRIGHT MORRIS & ARTHUR LLP
925 Euclid Avenue, Suite 1700
Cleveland, OH   44115-1483
(216) 443-9000 / (216) 443-9011 Fax
nquathamer@porterwright.com
czepp@porterwright.com

Attorneys for Plaintiff
The Board of Trustees of the Healthcare of Ontario
Pension Plan Trust Fund


CLEVELAND/401898v.4

11